## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | : | CHAPTER 11 |
| | : | (Jointly Administered) |
| **TROPICANA ENTERTAINMENT, LLC,**: | | |
| *et al.*[1] | : | Case No. 08-10856 (KJC) |
| | : | |
| Debtors | : | Re: Docket Nos. 3132, 3134, 3135 |

## MEMORANDUM
## REGARDING FEE ALLOCATION DISPUTE

The Liquidating LandCo Debtors and Tropicana Las Vegas, Inc. (collectively, the "LandCo Debtors") and the Steering Committee of Lenders to the OpCo Debtors (the "Steering Committee") filed objections to the Final Fee Applications filed by professional firms employed by the Debtors and the Official Committee of Unsecured Creditors (the "Creditors Committee") in this bankruptcy case.[2]  The issue to be determined by the Court is how to allocate the fees and

---

[1]The "Reorganized OpCo Debtors" are:  Adamar Garage Corporation;; Argosy of Louisiana, Inc.; Atlantic-Deauville, Inc.; Aztar Corporation; Aztar Development Corporation; Aztar Indiana Gaming Company, LLC;  Aztar Indiana Gaming Corporation; Aztar Missouri Gaming Corporation; Aztar Riverboat Holding Company, LLC; Catfish Queen Partnership in Commendam; Centroplex Centre Convention Hotel, L.L.C.;  Columbia Properties Laughlin, LLC; Columbia Properties Tahoe, LLC; Columbia Properties Vicksburg, LLC; CP Baton Rouge Casino, LLC; CP Laughlin Realty, LLC; Hotel Ramada of Nevada Corporation; Jazz Enterprises, Inc.; JMBS Casino LLC; Ramada New Jersey Holdings Corporation; Ramada New Jersey, Inc.; St. Louis Riverboat Entertainment, Inc.; Tahoe Horizon, LLC; Tropicana Entertainment Holdings, LLC; Tropicana Entertainment Intermediate Holdings, LLC; Tropicana Entertainment, LLC; Tropicana Express, Inc.; and Tropicana Finance Corp. (the "OpCo Debtors").
The "Liquidating LandCo Debtors" are: Adamar of Nevada Corporation; Hotel Ramada of Nevada Corporation; Tropicana Development Company, LLC; Tropicana Enterprises; Tropicana Las Vegas Holdings, LLC; Tropicana Las Vegas Resort and Casino, LLC; and Tropicana Real Estate Company, LLC (the "LandCo Debtors," and, together with the OpCo Debtors, the "Debtors").

[2]The professional firms employed by the Debtors are: Kirkland & Ellis, LLP; AlixPartners, LLP; Ernst & Young, LLP; KPMG LLP; Lazard Freres & Co., LLC; Paul, Hastings, Janofsky & Walker LLP: and Richards, Layton & Finger, P.A. (the "Debtor Professionals").  The professional firms employed by the Creditors Committee are: Capstone Advisory Group, LLC; Lionel, Sawyer & Collins; Stroock &

(continued...)

expenses incurred by the Professionals through June 30, 2009 (the "Professional Fees") between the Reorganized OpCo Debtors and the Liquidating LandCo Debtors (the "Allocation Dispute").

## Background - Stipulated Facts

For purposes of determining the Allocation Dispute, the parties have stipulated to uncontested facts, including the following:[3]

1.   **Employment of Professionals.**  Pursuant to various orders entered in the bankruptcy cases, the Debtor Professionals were employed by the Debtors collectively.[4]  The Committee Professionals were employed to represent the Creditors Committee with respect to the interests of all estates.

2.   **The LandCo Credit Facility.**  As of May 5, 2008, (the "Petition Date"), one of the

---

[2](...continued)
Stroock & Lavan LLP; and Morris, Nichols, Arsht & Tunnell, LLP (the "Committee Professionals"). The objections included the final fee application of Warren H. Smith & Associates, P.C. (the "Fee Auditor"). Together, the Debtor Professionals, the Committee Professionals, and the Fee Auditor are referred to herein as the "Professionals."

[3]The parties filed a Joint Pretrial Memorandum Related to Allocation Dispute with Respect to Objections to Final Fee Applications. (D.I. 3432.)  Many footnotes contained in the parties' Statement of Uncontested Facts have been omitted.

[4]One exception is Paul, Hastings, Janofsky & Walker LLP ("Paul Hastings"), which was employed as special counsel to the Litigation Committee of the Board of Directors of OpCo Debtor Tropicana Entertainment Holdings, LLC ("TEH"). (*See* D.I. 3432, n. 4.)  Although the Litigation Committee of TEH, a member of the OpCo Debtor family, was the applicant requesting employment of Paul Hastings, paragraph 8 of the Application (D.I. 777) states that, among the functions of the Litigation Committee is "investigating and prosecuting any causes of action that the *Debtors* may have against their former officers [emphasis added]."  "Debtors" are referred to in footnote 1 of the Application to include *all* of the debtors in these related chapter 11 filings, without regard to any OpCo/LandCo distinction. Paragraph 3 of the September 15, 2008 Order authorizing Paul Hastings' employment (D.I. 921) authorizes Paul Hastings to "render professional services to the *Debtors* . . . coordinate the Board's investigative efforts with those of the *Debtors*, Committee and Consortium . . . [and] potentially prosecute any causes of action brought by the *Debtors* . . . . [emphasis added]."  TEH was the penultimate parent of all of the Debtor (and non-debtor) entities.  Therefore, I will consider, for this purpose, Paul Hastings' services to have been rendered for the benefit of both the OpCo Debtors and the LandCo Debtors.

Debtors' operating businesses (the Las Vegas resort and casino) was pledged to secure the

LandCo Credit Facility. LandCo Debtor Tropicana Las Vegas Resort and Casino, LLC was the

borrower under the LandCo Credit Facility and each of the remaining LandCo Debtors were

guarantors thereof. The OpCo Debtors and their property were not liable for the LandCo Credit

Facility, including the approximately $442 million due and owing pursuant to the LandCo Credit

Facility as of the Petition Date.

3.    **The OpCo Credit Facility.** As of the Petition Date, all of the other Debtors' operating

businesses (casinos in Atlantic City, Lake Tahoe, Laughlin, Baton Rouge, Evansville, Mississippi

and elsewhere) were pledged to secure the OpCo Credit Facility. OpCo Debtor Tropicana

Entertainment, LLC (f/k/a Wimar OpCo, LLC), was the borrower under the OpCo Credit Facility

and the OpCo Guarantors[5] were guarantors thereof. OpCo Debtor, Aztar Corporation, held an

equity interest in LandCo Debtor Tropicana Las Vegas Holdings, LLC, that was pledged to

secure the OpCo Credit Facility. The LandCo Debtors and their property were not liable for the

OpCo Credit Facility, including the approximately $1.375 billion due and owing pursuant to the

OpCo Credit Facility as of the Petition Date.

4.    **The Administrative Order.** At the first-day hearing in these bankruptcy cases, the topic

of allocation of professional fees among the LandCo and OpCo estates was broached by counsel

for the Agent for the OpCo Credit Facility in connection with a potential carve-out. Following

that hearing, the Court entered the Administrative Order Establishing Procedures for Interim

Compensation and Reimbursement of Expenses for Professionals and Official Committee

Members (D.I. 269) (the "Administrative Order"), which provided:

---

[5]The OpCo Guarantors are defined in the OpCo Disclosure Statement, § II.D.1 (D.I. 1742).

3

With respect to any time entry in which a Professional is devoting its time specifically and primarily to matters affecting or relating to Tropicana Las Vegas Holdings, LLC or any of its direct or indirect subsidiaries [*i.e.,* the LandCo Debtors], such professional shall use all reasonable efforts to include at the beginning of such entry the words "Las Vegas."

5.    **The Debtors' Prepetition Debt.**  As of the Petition Date, the OpCo Debtors had approximately $2.53 billion in total debt, while the LandCo Debtors had approximately $448 million in total debt.  As of the Petition Date, there were an estimated $1.17 billion in total general unsecured claims allowable against the OpCo Debtor estates, and an estimated $6 million in total general unsecured claims allowable against the LandCo Debtors' estates.  Pursuant to the Plans, the unsecured deficiency claims of the lenders under the OpCo Credit Facility were an estimated $685.5 million and the unsecured deficiency claims of the lenders under the LandCo Credit Facility were Allowed (as defined in the LandCo Plan) in the settled amount of $72,749,156.00.

6.    **The Debtors' Businesses.**  At the time of the bankruptcy filing, the Debtors and their non-Debtor affiliate subsidiaries comprised one of the largest and most diversified privately-held hotel and casino gaming entertainment providers in the United States, with combined revenue for fiscal year ending December 31, 2007, of more than $1.0 billion.

As of the Petition Date, the OpCo Debtor owned the approximately 31-acre site, including all improvements thereon, on which the Tropicana Express is located and the riverboat in which the Casino Aztar Evansville conducts its operations.  In addition, the OpCo Debtors owned the riverboats on which the Belle of Baton Rouge, Vicksburg Horizon, and Jubilee casinos operate, as well as the 35-acre site in Laughlin, Nevada, including all improvements thereon, on which the River Palms operates.  The OpCo Debtors had a majority voting and

economic interest in the Lighthouse Point Casino riverboat.  The OpCo Debtors also had an

interest in the Tropicana Atlantic City Hotel and Casino and related assets (the "Tropicana AC").

As of the Petition Date, the LandCo Debtors owned the approximately 34-acre site,

including all improvements thereon, on which the Tropicana Las Vegas is located.

For the 12 months ended December 31, 2008, the OpCo Debtors, including the New

Jersey Entities (as defined in the OpCo Disclosure Statement), generated approximately

$1 billion in revenues.  For the 12 months ended December 31, 2008, the LandCo Debtors

generated approximately $118.5 million in revenues.

7.    **Confirmation of the Debtors' Plans.**  On May 5, 2009, the Court entered the *Findings*

*of Facts, Conclusions of Law, and Order Confirming First Amended Joint Plan of*

*Reorganization of Tropicana Entertainment, LLC and Certain of its Debtor Affiliates Under*

*Chapter 11 of the Bankruptcy Code* (D.I. 2001) (the "OpCo Confirmation Order") thereby

confirming the *First Amended Joint Plan of Reorganization of Tropicana Entertainment, LLC*

*and Certain of its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* (D.I. 1995) (as

amended pursuant to the OpCo Confirmation Order, the "OpCo Plan").

On the same day, the Court entered the *Findings of Facts, Conclusions of Law, and*

*Order Confirming First Amended Joint Plan of Reorganization of Tropicana Las Vegas*

*Holdings, LLC and Certain of its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code*

(D.I. 2002) (the "LandCo Confirmation Order"), thereby confirming the *First Amended Joint*

*Plan of Reorganization of Tropicana Las Vegas Holdings, LLC and Certain of its Debtor*

*Affiliates Under Chapter 11 of the Bankruptcy Code* (D.I. 1994) (as amended pursuant to the

LandCo Confirmation Order, the "LandCo Plan").

(a)    <u>Agreed Allocation of Management Services Fee</u>.  Between the period of time from the confirmation of the LandCo Plan on May 5, 2009, through the July 1, 2009 Effective Date of the LandCo Plan, the OpCo Debtors continued to manage the Tropicana Las Vegas hotel and casino.  Pursuant to the OpCo Plan and the LandCo Plan (collectively, the "Plans"), the Debtors entered into a Management Services Arrangement, which provided for (a) the reimbursement to the OpCo Debtors by the LandCo Debtors of the costs and expenses incurred by the OpCo Debtors (including, without limitation, taxes, regulatory fees, and legal and professional fees) that were directly attributable to the LandCo Debtors' operations; and (b) payment of a management services fee to the OpCo Debtors by the LandCo Debtors for corporate expenses that were not directly attributable to either the LandCo Debtors or the OpCo Debtors (including, without limitation, corporate overhead and the costs of the D&O tail insurance policy) in an amount equal to seventeen percent (17%) of such corporate expenses (the "Management Services Fee").  The percentage of indirect costs that represented the Management Services Fee was agreed to by the OpCo Debtors, on the one hand, and the LandCo Debtors, on the other hand, based on the relative aggregate revenues of the LandCo Debtors as compared to the aggregate revenues of the OpCo Debtors (including the New Jersey Entities).

(b)    <u>Agreed Allocation of Litigation Trust Proceeds.</u>  Pursuant to the Plans, a single Litigation Trust (as defined in the Plans) was created which holds all of the Insider Causes of Action (as defined in the Plans) held by either the OpCo Debtors or the LandCo Debtors.  The Litigation Trust exists for the purpose of pursuing such Insider Causes of Action and distributing the Litigation Trust Proceeds (as defined in the Plans) from any judgments, settlements, or recoveries.  The Litigation Trust agreement governs the Litigation Trust and provides for, among

6

other things, an allocation of the Litigation Trust Proceeds. Pursuant to the Plans, the Litigation

Trust Proceeds are to be allocated "on a Pro Rata basis determined by reference to the relative

amount of the OpCo Credit Facility Deficiency Claim and the LandCo Credit Deficiency Claim."

The Plans therefore provide for approximately ninety percent (90%) of the Litigation Trust

Proceeds to be distributed to creditors of the OpCo Debtors and approximately ten percent (10%)

of the Litigation Trust Proceeds to be distributed to creditors of the LandCo Debtors.

     (c)     <u>No Agreed Allocation of Professionals' Fees and Expenses.</u> No allocation

formula to allocate the Professionals' fees and expenses between the OpCo Debtors and the

LandCo Debtors during these bankruptcy cases was approved by the Court or publicly announced

by the Debtors. Accordingly, many of the Professionals devised their own allocation

methodology in connection with the Fee Applications.[6]

8.     **<u>Fee Allocations Proposed In the Fee Objections</u>**. Pursuant to the Steering Committee

Objection, the Steering Committee seeks a 50/50 allocation between the Reorganized OpCo

Debtors and the Liquidating LandCo Debtors of the amounts ultimately allowed pursuant to the

Fee Applications through the July 1, 2009 LandCo Plan Effective Date.[7]

---

[6]The Joint Pretrial Memorandum attached a chart (Ex. A), showing the proposed allocations to LandCo, as submitted by certain Professionals, as follows: (i) Kirkland & Ellis: 29.3%; (ii) Lazard: 16%; (iii) AlixPartners: 29.2%; (iv) Ernst & Young (auditor): 9% fees, 5% expenses; (v) Ernst & Young (tax advisor): 12% fees, 20% expenses; (vi) Paul Hastings: 0%; (vii) Richards Layton: 29.3%; and (viii) KPMG: 9.8%.

[7]There have been settlements with certain Professionals regarding objections to the reasonableness of fees or the percentage of an agreed amount or sum that a Debtor group will pay. However, the settlements with the Professionals provide that they do not affect the dispute between the OpCo Debtors and the LandCo Debtors about how to allocate the Professionals' fees and costs, although, regardless of how the Court resolves the Allocation Dispute, the settlements may, and do, fix certain rights between certain Debtors and certain Professionals. *See, e.g.,* the Settlement Agreement between the Steering Committee and Lazard attached to the Agreed Order approving that settlement (D.I. 3542)
(continued...)

In their objections, the LandCo Debtors ask the Court to allocate to the LandCo Debtors only the fees attributable specifically to the LandCo Debtors through the July 1, 2009 Effective Date of the LandCo Plan for each Professional (based on an analysis of individual time entries set forth in the Fee Applications), plus a percentage of the fees for services its counsel has identified as unallocable equal to the ratio of identifiable LandCo and OpCo services for that Professional, with final allocations ranging from 1% to 15%.

The following table summarizes the range of proposed allocations:

| Professionals' Proposed Aggregate Allocation to LandCo | LandCo Proposed Aggregate Allocation to LandCo | OpCo Proposed Allocation to LandCo |
|---|---|---|
| *Approximately 22.5%* | *Approximately 7.2%* | *50%* |

## Discussion

Section 330(a) of the Bankruptcy Code permits the bankruptcy court to award "reasonable" compensation to professional persons employed pursuant to § 327 or § 1103. A determination of reasonableness under § 330(a) is within the court's discretion. *In re Mushroom Transp. Co., Inc.,* 486 B.R. 148, 156 (Bankr. E.D.Pa. 2013) citing *Zolfo, Cooper & Co. v. Sunbeam-Oster Co., Inc.,* 50 F.3d 253, 257 (3d Cir. 1995). In determining the amount of reasonable compensation to be awarded to a professional, "the court should consider the nature, the extent, and the value of such services, taking into account all relevant factors . . ." 11 U.S.C. § 330(a)(3). The issue currently before me, however, is not the reasonableness of the *amount of*

---

[7](...continued)
(providing that upon payment of $2 million by the OpCo Debtors to Lazard, Lazard will seek no further payment from the OpCo Debtors).

Professional Fees (which, except as already resolved by the parties' stipulations, may be the subject of later hearings), but how to allocate fairly those fees between the OpCo Debtors and the LandCo Debtors.

From the beginning of this chapter 11 case, the parties recognized that the issue of how Professional Fees should be allocated among the various Debtor entities might arise later in the bankruptcy case. At the parties' suggestion, the Court entered the Administrative Order (D.I. 269) providing that Professionals should "use all reasonable efforts" to identify time that was specifically and primarily related to the LandCo Debtors by including the words "Las Vegas" at the beginning of the time entry.  Unfortunately, some Professionals were more diligent than others in their adherence to the Administrative Order. LandCo asserts that the Professionals failed to comply with the Administrative Order and, therefore, performed its own detailed analysis of the Professionals' invoices by identifying time entries as OpCo time, LandCo time, or "unallocated" time.[8]  Based on its analysis, the LandCo Debtors propose a separate allocation percentage for each Professional, resulting in allocating approximately 7.2% of the total Professional Fees to LandCo.  (D.I. 3427, Ex. A.)

In response, the Steering Committee argues that the Professionals' time entries reflect the reality that the Debtors operated as a consolidated enterprise and that there was no "rational

---

[8]At the evidentiary hearing, LandCo moved into evidence its written analysis, prepared by an attorney for LandCo, of each Professionals' detailed invoices (the "LandCo Analysis"). (Ex. 67 and Ex. 69.) OpCo argued that the LandCo Analysis should not be admitted into evidence because LandCo had not provided sufficient information about the analysis, noting that the deponent who appeared as the Fed.R.Civ.Pro. 30(b)(6) witness was unable to answer specific questions regarding the LandCo Analysis. The Court admitted the exhibits, noting that, without testimony providing a foundation as to how the analysis was conducted, it would be accorded little weight.  (D.I. 3456, Tr. at 95:23 - 96:2.)

9

method" to separate most of the work performed in the bankruptcy case among the Debtors.[9]
The Steering Committee contends that a 50/50 allocation of the Professionals' fees is fair.

LandCo suggests that, alternatively, the Court can allocate the Professional Fees based on
(1) the large disparity in the size of the Debtor groups' operations, as shown by the number of
casinos operated by each group (9% allocable to LandCo), the ratio of LandCo revenue to OpCo
revenue (12%), or ratio of total LandCo debt to OpCo debt (15%);[10] (2) the negotiated allocation
of litigation trust proceeds as set forth in the Plan (10% to LandCo), or (3) the parties' agreement
in the Management Services Agreement that the LandCo Debtors would be responsible for 17%
of corporate expenses that were not directly attributable to either the LandCo Debtors or the
Opco Debtors. These figures are all included in the parties' stipulated facts.

The Steering Committee disagrees, contending that most of the Professionals' time in this
case involved general bankruptcy issues that benefitted all of the Debtors. The Steering
Committee noted that a single management team operated all of the Debtors prior to the Plans'
effective dates. The Steering Committee relies, in part, on the testimony of Scott Butera
("Butera"), the former president of Tropicana Entertainment (an OpCo Debtor), who stated that,
from the bankruptcy filing until early 2009, the Debtors were operated as one enterprise, and
were intended to be reorganized together. (Tr. at 29:6 - 29:17; 39:5 - 39:11.) Butera testified that

---

[9]In its pre-trial memorandum, the Steering Committee describes its own analysis of the
Professionals' invoices, finding that many billing entries were too vague to allocate meaningfully as
primarily for either Debtor group. The Steering Committee searched for time entries containing the
words "OpCo" or "LandCo." The Steering Committee determined that the exiguous percentage of entries
that specified a Debtor group were split almost evenly, and allocated 46% of those entries to LandCo,
and 54% to OpCo. The LandCo Debtors argue that the Steering Committee's search was too limited,
particularly for failing to include "Las Vegas" as a search term.

[10]*See* LandCo post-hearing submission (D.I. 3499) at 5.

10

litigation involving other Debtors or the Atlantic City casino ultimately benefitted the LandCo Debtors, because losing a gaming license in one location would jeopardize licenses for other casinos. (Tr. at 30:24 - 31:13.) He further testified that bankruptcy court litigation seeking the appointment of a trustee, which resulted in an agreement by the Debtors' former CEO and Chairman of the Board to step down, benefitted the LandCo Debtors by providing stability to the companies and allowing settlement with unions. (Tr. at 34:12 - 35:9.) Therefore, the Steering Committee asserts that both Debtor groups benefitted mutually from the Professionals' work during the bankruptcy case, regardless of the amount at stake or the number of casino properties involved. The Steering Committee argues that both Debtor groups should be equally liable.

Taking into account the totality of the record in this case and my own experience with these matters, often complex and contentious, I conclude that neither the Steering Committee's nor the LandCo Debtor's proposed allocation amounts are appropriate. First, the analyses of the Professionals' billing records performed by both the LandCo Debtors and the Steering Committee are born of advocacy and cannot be fully relied upon. The LandCo Debtors failed to provide a sufficient foundation to support their analysis, and the Steering Committee's analysis is based on too limited a sampling of the time entries. The main challenge stems from the fact that too many of the time entries are not allocated to a particular Debtor group and are too vague to do so accurately, in hindsight.

Second, the Steering Committee's proposed 50/50 allocation fails to account for the large disparity in the size of the operations or amount of debt held by the two groups of Debtors. The benefit that the LandCo Debtors supposedly received from litigation that was specific to particular OpCo Debtors is too tenuous to support a one-half allocation.

11

On the other hand, the LandCo Debtor's proposed 90/10 allocation fails to consider that the Debtors, part of an extensive and intertwined corporate family, were managed and operated as a single enterprise for a large part of the bankruptcy case. Chapter 11 debtors and their professionals must undertake many time-consuming and expensive tasks, regardless of the size of the estate or the number of creditors. An allocation based solely on the amount of debt or number of casino properties would be inequitable.

Having considered, but rejected, the parties' proposed allocations, I must look elsewhere for a principled approach to allocating the Professional Fees. One factor to consider is the allocation prepared retrospectively by a number of the Professionals, individually.[11] The Steering Committee argues that those proposed allocations are unreliable, since they are based on reconstructed records, and further contends that the Professionals have not provided detailed explanations of their methodology for allocating the fees. The Professionals, themselves, have noted the difficulty in allocating their fees between the two Debtor groups, and argue credibly that many services benefitted both the OpCo and LandCo debtors. (*See* AlixPartners' Pre-Hearing Mem. (D.I. 3428) at 12; Capstone Pre-Hearing Mem. (D.I. 3437) at 3-4.)[12] The allocation percentage of fees to LandCo, as proposed by the respective Professionals, range from 0% (Paul Hastings) to 29.3% (Kirkland & Ellis).

Taking into account the various positions of all parties, and acknowledging the difficulty, not only for the Professionals, but for the Court as well, of reaching a fair and principled result,

---

[11]*See* n. 6, *supra.*

[12] The Completion Fee sought by Lazard Freres & Co., LLC ("Lazard") was based on the amount of debt restructured, not hours worked. Therefore, Lazard based its allocation on the amount of debt held by each Debtor Group. (Lazard Pre-Hearing Mem. (D.I. 3429 at 5 - 6.)

and recognizing that many services benefitted both Debtor groups, I conclude that the

Professional Fees should be allocated 75% to the OpCo Debtors and 25% to the LandCo

Debtors.[13]

      The Steering Committee and the LandCo Debtors shall meet and confer to determine

which fee objection issues are yet to be resolved and should  file a joint statement with the Court

reflecting the remaining issues, if any.  An appropriate order follows.


                      BY THE COURT:

                      _____

                      KEVIN J. CAREY
                      UNITED STATES BANKRUPTCY JUDGE

Dated: December 30, 2014

---

[13]This allocation shall not apply to the Completion Fee earned by Lazard, which is based on the amount of debt restructured. Lazard proposed that the Completion Fee be allocated 16.2% to the LandCo Debtors (based upon approximately $440 million in LandCo Debtor institutional debt) and 83.8% to the OpCo Debtors (based upon approximately $2.281 billion in OpCo Debtor institutional debt).  (*See* D.I. 3429 at 5.)  This allocation is approved by the Court with respect to Lazard's Completion Fee.