UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | CHAPTER 11 |
| | : | |
| TROPICANA | : | |
| ENTERTAINMENT, LLC, et al.[1] | : | Case No. 08-10856 (KJC) |
| | : | (Re: D.I.s 3019, 3022) |

## MEMORANDUM[2]

## BY:   KEVIN J. CAREY, UNITED STATES BANKRUPTCY JUDGE

Before the Court are two motions for summary judgment (the "Motions for Summary

Judgment") filed by Wimar Tahoe Corporation f/k/a Tropicana Casino and Resorts, Inc.

("Wimar") (D.I. 3019) and Columbia Sussex Corporation ("Columbia") (D.I. 3022).  Wimar

seeks allowance and payment of administrative expenses, pursuant to Bankruptcy Code

§ 503(b)(1)(A) or, in the alternative, § 503(b)(3)(D), for management services and personnel

provided to certain Debtors under various service agreements.  Columbia seeks allowance and

payment of prepetition priority claims pursuant to Bankruptcy Code § 507(a)(5) or, in the

---

[1] The chapter 11 cases for the following debtors have been jointly administered: Adamar Garage Corporation; Adamar of Nevada Corporation; Argosy of Louisiana, Inc.; Atlantic–Deauville, Inc.; Aztar Corporation; Aztar Development Corporation; Aztar Indiana Gaming Company, LLC; Aztar Indiana Gaming Corporation; Aztar Missouri Gaming Corporation; Aztar Riverboat Holding Company, LLC; Catfish Queen Partnership in Commendam; Centroplex Centre Convention Hotel, L.L.C.; Columbia Properties Laughlin, LLC; Columbia Properties Tahoe, LLC; Columbia Properties Vicksburg, LLC; CP Baton Rouge Casino, LLC; CP Laughlin Realty, LLC; Hotel Ramada of Nevada Corporation; Jazz Enterprises, Inc.; JMBS Casino LLC; Ramada New Jersey Holdings Corporation; Ramada New Jersey, Inc.; St. Louis Riverboat Entertainment, Inc.; Tahoe Horizon, LLC; Tropicana Development Company, LLC; Tropicana Enterprises; Tropicana Entertainment Holdings, LLC; Tropicana Entertainment Intermediate Holdings, LLC; Tropicana Express, Inc.; Tropicana Finance Corp.; Tropicana Las Vegas Holdings, LLC; Tropicana Las Vegas Resort and Casino, LLC; and Tropicana Real Estate Company, LLC (collectively, the "Debtors").

[2] This Memorandum constitutes the findings of fact and conclusions of law, required by Fed. R. Bankr. P. 7052.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(1) and (b)(2)(B).

alternative, § 503(b)(3)(D), for providing an insured health program and 401(k) program under various service agreements for the 180 days preceding the petition date.  Columbia also seeks allowance and payment of administrative expense claims pursuant to Bankruptcy Code § 503(b)(1)(A) or , in the alternative, § 503(b)(3)(D), for services rendered postpetition.

For the reasons set forth below, the Court will deny Wimar's Motion for Summary Judgment.  Also, for the reasons set forth below, Columbia's Motion for Summary Judgment will be granted, in part, to allow priority status under Bankruptcy Code § 507(a)(5) for contributions to employee benefit plans made within 180 days preceding the Petition Date, and will be denied, in part, regarding Columbia's request for payment of the priority claims under § 507(a)(5) until it is determined whether the claim amount exceeds the limitations of § 507(a)(5)(B).  Moreover, Columbia's Motion for Summary Judgment for allowance and payment of claims based upon Bankruptcy Code § 503(b)(1)(A) and § 503(b)(3)(D) will be denied.

## *BACKGROUND*

On May 5, 2008, Tropicana Entertainment, LLC ("Tropicana") and several related entities (the "Debtors") filed voluntary chapter 11 bankruptcy petitions in this Court (the "Petition Date").  The Debtors were affiliated hotels and casinos located in Nevada, Mississippi, New Jersey, Indiana and Louisiana.  On May 14, 2008, the United States Trustee for the District of Delaware appointed an Official Committee of Unsecured Creditors (the "Committee").

On July 10, 2008, the Court entered the Order Establishing Bar Dates for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof (the "Bar Date Order") setting September 26, 2008 as the deadline to file prepetition proofs of claim against the Debtors (the

"Bar Date") (D.I. 604). On September 26, 2008, Wimar and Columbia filed proofs of claim.

On May 5, 2009, the Court entered orders (D.I.s 2001, 2002) confirming the First Amended Joint Plan of Reorganization of Tropicana Entertainment, LLC and Certain of its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code (the "OpCo Plan") and the First Amended Joint Plan of Reorganization of Tropicana Las Vegas Holdings, LLC and Certain of its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code (the "LandCo Plan" and, together with the OpCo Plan, the "Plans"). The LandCo Plan and the OpCo Plan became effective on July 1, 2009 and March 8, 2010, respectively. The deadlines to file administrative expense claims against the Debtors under the LandCo Plan and the OpCo Plan were July 31, 2009 and April 7, 2010, respectively (D.I.s 2203, 2794).

On March 31, 2009, Wimar and Columbia filed motions for allowance and immediate payment of administrative expense claims against the Debtors (D.I.s 1782, 1784). Objections to Wimar's and Columbia's administrative expense claims were filed by the Committee (D.I. 1924) and the Steering Committee of Senior Secured Lenders (D.I. 1939).

On August 4, 2010, Wimar and Columbia filed the Motions for Summary Judgment with respect to their motions for payment of administrative expense claims (D.I.s 3019, 3022). Wimar sought allowance and payment of an administrative expense claim in the amount of $1,337,376.55.[3] Columbia sought allowance and payment of administrative expense claims in the amount of $3,703,130.94 with respect to prepetition employee benefit claims, and

---

[3] In its reply brief, Wimar reduced its claim from $1,359,689.48 to $1,337,376.55 for various reasons, including adjustments to exclude claims for prepetition payroll and claims that should have been asserted against non-debtor entities. (D.I. 3185 at n.3).

$1,161,250.91[3] with respect to postpetition claims.

On October 22, 2010, the LandCo Debtors[4] filed an objection to the Motions for Summary Judgment (the "LandCo Debtors' Objection") (D.I. 3122) and, on the same date, the OpCo Debtors[5] also filed an objection to the Motions for Summary Judgment (the "OpCo Debtors' Objection') (D.I. 3124). Lightsway Litigation Services, LLC, as Trustee of the Tropicana Litigation Trust established by the Plans (the "Litigation Trustee"), filed a joinder to the objections. On December 31, 2010, Wimar and Columbia filed reply briefs (D.I.s 3185, 3186). On April 6, 2011, the OpCo Debtors filed a supplemental objection (the "Supplemental Objection") (D.I. 3361). The Court heard oral argument on the Motions for Summary Judgment and took the matters under advisement.

On February 17, 2010, the Litigation Trustee filed an adversary complaint against William J. Yung, III ("Yung"), Wimar, Columbia and others, alleging, among other things, that:

> Yung, individually and in concert with [Wimar] and Columbia[,] engaged in repeated acts of misconduct, demonstrating gross negligence, disloyalty, bad faith, and reckless indifference to the best interests of the Debtors and Debtors' creditors, concerning the operation and management of numerous casinos and gaming properties, including the Tropicana Atlantic City and the Casino Aztar Evansville.

---

[3] In its reply brief, Columbia reduced its claim from $1,168,715.58 to $1,161,250.91 for various reasons including duplicate amounts and adjusting certain amounts originally claimed as owed by the LandCo Debtors, but actually owed by the OpCo Debtors. (D.I. 3186 n.5.)

[4] For the purposes of this Memorandum, the LandCo Debtors shall be defined according to the LandCo Debtors' Objection (the "LandCo Debtors") (D.I. 3122 n.1).

[5] For the purposes of this Memorandum, the Reorganized OpCo Debtors shall be defined according to the OpCo Debtors' Objection (the "OpCo Debtors") (D.I. 3124 at n.1).

(Adv. No. 10-50289, Adv. D.I. 1, ¶5.)[6]  The defendants filed a motion to dismiss the

adversary complaint, and on February 9, 2011, the Litigation Trustee filed an amended

complaint asserting five causes of action: (i) breach of fiduciary obligations; (ii) aiding

and abetting breach of fiduciary obligations; (iii) breach of contract; (iv) breach of the

covenant of good faith and fair dealing; and (v) equitable subordination.  The defendants

filed a motion to dismiss the amended complaint, and I issued a decision granting the

motion to dismiss, in part, by (i) dismissing Count One (breach of fiduciary duty) and

Count Two (aiding and abetting breach of fiduciary duty); (ii) dismissing Count Three

(breach of contract) as to any breach of contract claim based upon contracts not attached

to or specifically identified in the Amended Complaint; and (iii) dismissing Count Five

(equitable subordination), without prejudice.  (Adv. D.I.s 91, 92).[7]  Currently, the parties

in the adversary proceeding are engaging in discovery.


### MOVANTS' STATEMENT OF FACTS

#### A. Wimar's Claims [8]

Wimar and certain of the Debtors (the "CSA Debtors") are parties to four casino services

agreements (the "Casino Services Agreements") pursuant to which Wimar agreed to provide

---

[6]The adversary complaint was attached as Ex. 1 to the Declaration in Support of the LandCo Debtors' objection (D.I. 3123) and as Ex. A to the Declaration in Support of the OpCo Debtors' objection (D.I. 3124).

[7]The Litigation Trustee filed a motion for leave to appeal the Memorandum and Order granting, in part, and denying, in part, the Motion to Dismiss.  The United States District Court for the District of Delaware denied the motion for leave to appeal (Adv. D.I. 110).

[8]Wimar's Statement of Facts are set forth in the Memorandum of Law in support of the Motion for Summary Judgment (D.I. 3020) and the Affidavit of Theodore Mitchel (D.I. 3021).

management services and personnel to the CSA Debtors in exchange for compensation.

Wimar performed services under the Casino Services Agreements. The casino management services included, without limitation, supervision of operations, regulatory oversight and compliance, and financing matters. Wimar also paid expenses for the CSA Debtors, including postpetition expenses, related to employment matters, staffing, payroll processing, advertising, gaming equipment, and supply purchases, among others. Wimar then allocated those expenses among the CSA Debtors in the form of management fees.

For example, from the Petition Date to September 1, 2008, Wimar employed approximately 32 individuals, including the CSA Debtors' executive management team, to perform services for the CSA Debtors and, in some cases, for Wimar's non-debtor casinos. Wimar paid the salaries of these employees and withheld certain amounts from their paychecks related to taxes and employee benefit plans. Wimar also paid the insurance and benefits costs of the employees working for the CSA Debtors including health care, dental and vision plans, vacation time, and retirement savings plans.

On September 1, 2008, those individuals who had previously been employed by Wimar to perform services for the CSA Debtors transitioned to employment directly with the CSA Debtors. At such time, Wimar ceased to be responsible for employment, staffing, and payroll matters related to these employees.

The Casino Services Agreements provide that the applicable CSA Debtor counterparty "will pay to [Wimar] in monthly installments an estimate of its allocated portion of [Wimar]'s headquarters operating expenses, excluding interest expense and costs directly attributable to a specific casino operation." (D.I. 3021, Ex. A ¶ 5). Wimar and AlixPartners, LLP

("AlixPartners"), the Debtors' restructuring advisors, worked together to determine the appropriate management fee allocation schedule for the CSA Debtors. Under this schedule, Wimar attributed to each CSA Debtor counterparty in its books and records its allocated proportion of the headquarters operating expenses as follows: (i) 72.22% allocable to Tropicana Entertainment, (ii) 10.79% allocable to Tropicana Las Vegas, (iii) 5.12% allocable to Vicksburg, and (iv) 5.26% allocable to Jubilee. The remaining 6.6% was allocable to non-debtor entities under Wimar's ownership. Beginning in 2009, Wimar calculated the appropriate "true up" adjustment amounts based on Wimar's actual 2008 operating expenses. On February 4, 2009, Wimar issued final invoices (with the "true up" adjustments) for the management services to each CSA Debtor.

In addition to the management fee invoices, Wimar sent invoices to CSA Debtors for reimbursement of miscellaneous amounts not included in the management fee allocation, such as advertising expenses.

Wimar filed its Motion for Allowance and Immediate Payment of Administrative Expense Claim ("Wimar's Original Motion") requesting payment of an administrative expense claim of $2,055,259.12, comprising $1,935,933.10 in postpetition management fees and $119,326.02 in postpetition miscellaneous fees. (D.I. 3021 at 10.) After the parties engaged in written discovery, Wimar adjusted its administrative claim to deduct amounts chargeable to non-debtor CSA counterparties and amounts paid after the filing of the Wimar's Original Motion. Following the adjustments, the management fees portion of the administrative expense claim was reduced to $1,326,846.43, and the miscellaneous portion of the administrative expense claim was reduced to $2,792.50, for a total administrative expense claim of $1,359,689.48. (*Id.*)

7

**B. Columbia's Claims[9]**

Columbia and certain of the Debtors (the "SA Debtors") are parties to agreements (the "Service Agreements") pursuant to which Columbia agreed to provide accounting and management services to the SA Debtors in exchange for compensation. Columbia's prepetition claim consists of (i) premiums under the health and dental insurance policies provided by Columbia for employees of the SA Debtors and payments made into a flexible spending plan in the aggregate amount of $3,685,684.94, and (ii) payments made under the 401(k) plan established by Columbia for eligible employees of the SA Debtors in the amount of $17,446.00.

The Service Agreements provided that Columbia was to establish various insurance programs, including a self-insured health program, for the Debtors. Columbia provided medical, dental, vision, prescription drug, and short-term disability benefits to the employees of the SA Debtors. During the 180 days preceding the Petition Date, Columbia provided health insurance coverage to approximately 3,160 employees and dental insurance coverage to approximately 2,492 employees of the SA Debtors.

Columbia sponsored a qualified 401(k) retirement savings plan (the "401(k) Plan") for eligible employees of the SA Debtors, pursuant to the Service Agreements. Columbia's services under the 401(k) Plan consisted of administration of the employee benefit plan provided by the SA Debtors. From December 1, 2007 through February 29, 2008, approximately 4,105 employees of the SA Debtors participated in the 401(k) Plan. The SA Debtors provided a matching contribution equal to 50% of the employees' contributions, subject to a maximum of

---

[9]Columbia's Statement of Facts are set forth in the Memorandum of Law in support of the Motion for Summary Judgment (D.I. 3024) and the Affidavit of Theodore Mitchel (D.I. 3025).

8

6% of the respective employee's salary.

Columbia's postpetition claim consists of (i) reimbursement of third-party invoices or other charges paid by Columbia on account of goods or services received by the SA Debtors, (ii) postpetition payment of claims made by the SA Debtors and their employees for actual losses incurred within the deductible levels under the general liability and workers' compensation insurance policies, together with the postpetition "true up" of premium payments, and (iii) postpetition payments made to administer the 401(k) Plan. The Service Agreements provide for the payment of these costs and expenses.

Columbia contracted with a number of third-party vendors on behalf of the SA Debtors and incurred expenses for services such as shipping charges, rent for office space, salaries for temporary employees, telephone bills, license fees, recruiting expenses, corporate credit card charges, and payments under flexible spending plans. On a monthly basis and continuing during the postpetition period, Columbia sent invoices to the SA Debtors requesting reimbursement for these expenses.

Columbia arranged workers' compensation and general liability insurance for the SA Debtors, as provided under the Service Agreements, with the Chubb Group of Insurance Companies ("Chubb"). For workers' compensation policies, Chubb calculated annual premiums based on the payroll of the entities covered by Columbia's master policy. Columbia then allocated the premium to the SA Debtors, using a weighted average based on the payroll at the SA Debtors' properties. Under the general liability policies, premiums were calculated based on sales figures. Columbia paid the premiums, and then allocated the applicable premium, calculated by a weighted average based on sales at the SA Debtors' properties as compared to the

total sales at all SA Debtors.  Columbia continued to provide administrative services under the

401(k) plan until July 1, 2009, when this Court entered an order authorizing the rejection of the

Service Agreements.  (D.I. 1891).

### STANDARD FOR SUMMARY JUDGMENT

Rule 56 of the Federal Rules of Civil Procedure, made applicable by Federal Rule of

Bankruptcy Procedure 7056, provides that "[t]he court shall grant summary judgment if the

movant shows that there is no genuine dispute as to any material fact and the movant is entitled

to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  At the summary judgment stage, the

court's function is not to weigh the evidence and determine the truth of the matter, but to

determine whether there is a genuine issue for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 249 (1986).

The moving party bears the burden of establishing the absence of a genuine dispute as to

a material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) ("[A] party seeking

summary judgment always bears the initial responsibility of informing the district court of the

basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any,' which it believes

demonstrate the absence of a genuine issue of material fact.").  When the nonmoving party bears

the burden of persuasion at trial, the moving party "may meet its burden . . . by showing that the

nonmoving party's evidence is insufficient to carry that burden."  *Foulk v. Donjon Marine Co.,*

*Inc.,* 144 F.3d 252, 258 n.5 (3d Cir. 1998) (quoting *Wetzel v. Tucker,* 139 F.3d 380, 383 n.2 (3d

Cir. 1998)).

Once the moving party has carried its initial burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Summary judgment cannot be avoided by introducing only "a mere scintilla of evidence," *Sarko v. Penn-Del Directory Co.,* 968 F.Supp. 1026, 1031 (E.D. Pa. 1997) (citation omitted), *aff'd* 189 F.3d 464 (3d Cir. 1999), or by relying on "conclusory allegations, improbable inferences and unsupported speculation." *J.Geils Band Emp. Benefit Plan v. Smith Barney Shearson, Inc.*, 76 F.3d 1245, 1251 (1st Cir. 1996). "Brash conjecture coupled with earnest hope that something concrete will materialize, is insufficient to block summary judgment." *Id.* (quoting *Dow v. United Bhd. of Carpenters*, 1 F.3d 56, 58 (1st Cir. 1993)).

Substantive law determines which facts are material; only disputes over facts that might affect the outcome of the suit will preclude summary judgment. *Anderson,* 477 U.S. at 248. Moreover, a dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id. See also Delta Mills, Inc. v. GMAC Comm. Fin., LLC (In re Delta Mills, Inc.)*, 404 B.R. 95, 105 (Bankr. D. Del. 2009) (An issue is genuine "when reasonable minds could disagree on the result."). The Court must resolve all doubts and consider the evidence in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255 ("[T]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.").

11

## DISCUSSION

### A. *Wimar's Claims*

#### 1. *Wimar's Claim Under Bankruptcy Code Section 503(b)(1)(A)*

Wimar argues that it is entitled to allowance of an administrative expense claim for its payment of actual and necessary postpetition expenses of the Debtors. Bankruptcy Code § 503(b)(1)(A), the Court may allow as administrative expenses, "the actual, necessary costs and expenses of preserving the estate, including wages, salaries, commissions for services rendered after the commencement of the case." A claim is entitled to priority treatment under § 503(b)(1)(A) if the applicant proves that "'the debt [arises] from a transaction with the debtor-in-possession . . . [and] the consideration supporting the claimant's right to payment [is] beneficial to the debtor-in-possession in the operation of the business.'" *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 532–33 (3d Cir. 1999) (quoting *Cramer v. Mammoth Mart, Inc. (In re Mammoth Mart, Inc.)*, 536 F.2d 950, 954 (1st Cir. 1976) (first alterations in original)); *accord In re Women First Healthcare, Inc.*, 332 B.R. 115, 121 (Bankr. D. Del. 2005) ("To establish an administrative claim under [§ 503(b)(1)(A)], there must be (1) a postpetition transaction between the claimant and the estate and (2) a benefit to the estate."). In the *Marcal Paper Mills* decision, the Third Circuit noted:

> These requirements balance two important goals. By giving priority to those claims that help keep the debtor-in-possession functioning, sections 503 and 507 advance the estate's interest in survival above all other financial goals. By limiting priority to those claims that are actual and necessary, the Code prevents the estate from being consumed by administrative expenses, and preserves the estate for the benefit of the creditors.

*In re Marcal Paper Mills, Inc.*, 650 F.3d 311, 315 (3d Cir. 2011) (internal punctuation and citations omitted).

Wimar argues that it has satisfied this standard because it incurred expenses during the postpetition period for employee-related expenditures including salaries, benefits, withholdings, deductions, temporary employee salaries, vacation pay and travel expenses to compensate employees of the CSA Debtors.  Wimar contends that these services benefitted the estates because failure to provide the employee-related services would have hampered the Debtors' ability to reorganize.  Wimar argues that the services allowed the Debtors to continue to operate and preserved the value of their business.

In their objections to the Motions for Summary Judgment, the LandCo Debtors and the OpCo Debtors argue: (i) that the Motions for Summary Judgment should not be decided while the adversary complaint is pending; and (ii) that there are numerous issues of material fact regarding the amounts requested under the Service Agreements.  They assert that Wimar has not provided sufficient information to determine whether various individuals whom Wimar claims worked primarily for the benefit of the Debtors actually did so.  The OpCo Debtors argue that Wimar's claim includes several mistakes, e.g., $338,074.63 for payroll expenses paid by Wimar *prior* to the Petition Date; $38,567.65 for temporary staff accountants, although Columbia was required to provide accounting services to the Debtors in exchange for monthly fees;  and $30,050.54 in payroll expenses for four employees who did not work for the OpCo Debtors in the fourth quarter of 2008.  For these reasons, the Debtors argue that Wimar has failed to demonstrate that there are no genuine issues as to material facts with respect to its claim for administrative expense status pursuant to § 503(b)(1)(A).   In its Reply Brief, Wimar disputes the errors claimed by the OpCo Debtors and argues that there are no factual issues.

I conclude that summary judgment is not appropriate at this time.  First, Wimar has failed to show that there are no genuine disputes as to material facts underlying its claim. The parties have provided competing declarations regarding the accuracy of the amounts underlying Wimar's administrative claim.  At this stage, the  Court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson,* 477 U.S. at 249.

A § 503(b)(1)(A) applicant must demonstrate that "the costs and fees for which it seeks payment provided an actual benefit to the estate and that such costs and expenses were necessary to preserve the value of the estate assets." *O'Brien Envtl.,* 181 F.3d at 533 (citations omitted). The pending adversary proceeding raises claims against Wimar for breach of contract and breach of the implied covenant of good faith and fair dealing in managing the Debtors.  These claims may affect an analysis of the extent to which Wimar's management fees provided an actual benefit to the estate.  For this reason, Wimar's request for payment of an administrative claim and the remaining claims in the adversary proceeding should be determined together.  Wimar's request for summary judgment on its motion for payment of an administrative claim under Bankruptcy Code § 503(b)(1)(A) will be denied.

2. *Wimar's Claim Under Bankruptcy Code Section 503(b)(3)(D)*

Wimar argues in the alternative that it is entitled to payment pursuant to § 503(b)(3)(D), which authorizes a Court to award administrative expense status to the claim of a creditor that

makes a "substantial contribution" in the chapter 11 case.[10]    Section 503(b)(3)(D) "represents an

accommodation between the twin objectives of encouraging meaningful creditor participation in

the reorganization process and keeping fees and administrative expenses at a minimum so as to

preserve as much of the estate as possible for the creditors." *Lebron v. Mechem Fin. Inc.*, 27

F.3d  937, 944 (3d Cir. 1994) (citations and internal punctuation omitted).

While the term "substantial contribution" is not defined in the Bankruptcy Code, courts

have narrowly tailored instances under which a creditor can be paid from the estate for assisting

the overall reorganization.  "[T]he applicable test is whether the efforts of the applicant resulted

in an actual and demonstrable benefit to the debtors' estates and the creditors." *Id*.  The Third

Circuit further decided:

> [T] he purpose of § 503(b)(3)(D) is to encourage activities that will benefit the estate
> as a whole, and in line with the twin objectives of § 503(b)(3)(D), "substantial
> contribution" should be applied in a manner that excludes reimbursement in
> connection with activities of creditors and other interested parties which  are
> designed  primarily to serve their own interests and which, accordingly, would have
> been undertaken absent an expectation of reimbursement from the estate.

*Lebron v. Mechem Fin. Inc.*, 27 F.3d 937, 944 (3d Cir. 1994)

---

[10]Bankruptcy Code § 503(b) provides, in pertinent part:

(b)     After notice and a hearing, there shall be allowed administrative expenses, other than claims
allowed under section 502(f) of this title, including–

. . . .

(3)     the actual, necessary expenses, other than compensation and reimbursement specified in
paragraph (4) of this subsection, incurred by–

. . . .

(D)     a creditor, an indenture trustee, an equity security holder, or a committee
representing creditors or equity security holders other than a committee
appointed under section 1102 of this title, in making a substantial contribution in
a case under chapter 9 or 11 of this title;

11 U.S.C.A. § 503(b)(3)(D).

Wimar argues that it has satisfied this standard because the services rendered (namely, employee related expenditures including salaries, benefits, withholdings, deductions, vacation pay, travel related expenses, and payments to third party-vendors for the provision of services for the benefit of the CSA Debtors) provided a direct, significant and demonstrable benefit to the estates by allowing the CSA Debtors to operate postpetition.  Further, Wimar argues that it provided those services with the expectation that the Debtors would reimburse it in compliance with the Casino Services Agreements.

The LandCo Debtors and the OpCo Debtors argue that Wimar has failed to demonstrate that its management services provided a substantial contribution to the estates based on the outstanding claims in the pending adversary proceeding. The LandCo Debtors also argue that Wimar was acting in its own interest when it paid the salaries, benefits and related expenses for its own employees, who provided services to Debtors in their capacity as Wimar employees.  The LandCo Debtors argue that Wimar would have paid these expenses absent an expectation of reimbursement from the estates.

"Because creditors are presumed to act primarily in their own interest and not for the benefit of the estate as a whole, they have the burden of proving by a preponderance of the evidence that they made the requisite substantial contribution." *In re Buckhead Am. Corp.,* 161 B.R. 11, 15 (Bankr. D. Del. 1993).  Here, the test is whether Wimar's management services provided an actual and demonstrable benefit to the Debtors.  The pending adversary proceeding raises issues of material fact about whether the management services provided a benefit to the Debtors.  Further, Wimar has not shown which, if any, employees provided a direct benefit to the Debtor's estates.  There are issues of fact about whether Wimar acted in its own interest to

16

pay its own employees. Wimar has not provided sufficient information to support summary

judgment on this claim. Therefore, summary judgment will be denied.[11]

## B. *Columbia's Claims*

### 1. *Columbia's Prepetition Claim Under Bankruptcy Code Section 507(a)(5)(A)*

Columbia argues that its prepetition claim arising from unpaid contributions to the SA

Debtors' employee benefits plan within the 180 days preceding the Petition Date is entitled to

priority treatment under the plain language of Bankruptcy Code § 507(a)(5).

The Debtors argue that § 507(a)(5) is not applicable to Columbia's claim because it

provides priority treatment only for fringe benefit claims paid to *employees*. *See Edward W.*

*Minte Co., Inc. v. Franey & Parr (In re Edward W. Minte Co., Inc.)*, 286 B.R. 1, 7-8 (Bankr.

---

[11] In its reply brief, Wimar argued for the first time that a portion of its claim that was determined to be based on pre-petition payroll charges was entitled to priority status pursuant to § 507(a)(4) for expenses incurred prior to the Petition Date as "wages, salaries, or commissions . . . earned by an individual" pre-petition. (D.I. 3185 at p. 13). I allowed the parties to submit a letters addressing this issue after oral argument. The OpCo Debtors argue that Wimar is not entitled to an administrative expense claim under § 507(a)(4) because it is not an individual employee of the OpCo Debtors, as contemplated by the statute, and Wimar bases its claim for prepetition payroll expenses on services provided by its own employees pursuant to the Casino Service Agreements. (D.I. 3567 at p. 2).

I conclude that Wimar is not entitled to summary judgment on its request for payment of a priority claim pursuant to § 507(a)(4). Priority provisions such as § 507(a)(4) are to be construed narrowly. *In re Trump Enter. Resorts, Inc.*, 2015 WL 1084294, at * 5 (Bankr. D. Del. Mar. 9, 2015). Here, Wimar was engaged in a business relationship with the OpCo Debtors to provide management services, including employees, for which the OpCo Debtors would compensate Wimar. Wimar's claim is based on management fees which it earns pursuant to fulfilling its obligations under the Casino Services Agreements, not solely the wages earned by the employees it provided. There is no employer-employee relationship between Wimar and the Debtors. *See e.g. In re Grant Indus., Inc.*, 133 B.R. 514, 515 (Bankr. W.D. Mo. 1991) ("The key distinction is between those claimants who are truly engaged in a master/servant relationship with the debtor and those who are engaged in a contractual relationship with the debtor. 'This relationship is the true test, and to entitle the claim to priority should be one where there . . . is a real status of employee and employer between the claimant and the bankrupt.'") (quoting *In re Progressive Luggage Corp.*, 34 F.2d 138 (2d Cir. 1929); *see also In re Ageloff*, 40 F.Supp. 369, 370 (S.D.N.Y. 1939) ("It has often been held that to be entitled to priority as wages for a workman, clerk or servant, the claim must be such as arises from the relation of master and servant as distinguished from a mere contractual relationship").

D.D.C. 2002) (deciding that the legislative history of § 507(a)(5) "reveals that it was intended to

protect employees or administrators of employee benefit plans representing their interests[,]" not

insurance companies with claims for unpaid premiums).  Further, the Debtors assert that the term

"services rendered" in § 507(a)(5) refers to services of employees, not of third parties, such as an

insurance company.  *Id.* at 9.  In *Southern Star Foods,* the Court wrote:

> [I]nsurance premiums do not arise from "services rendered" by employees as
> required under § 507(a)(4). The rendering of services by employees results in
> obligations to them, not to the insurer. *Montaldo,* 207 B.R. at 114. The claim for
> unpaid premiums does not arise from "services rendered" but from Southern Star's
> failure to pay its insurer. This makes it indistinguishable from a typical unsecured
> claim.[12]

*In re Southern  Star Foods, Inc.*, 210 B.R. 838, 841 (B.A.P. 10th Cir. 1997) aff'd, 144 F.3d 712

(10th Cir. 1998).

In reply, Columbia argues that if Congress had intended §507(a)(5)'s grant of priority to

apply to employees only, it could have phrased the statutory language specifically as it did in

§ 507(a)(4).  *Ivey v. Great West Life & Annuity Ins. Co.,* 308 B.R. 752, 756 (M.D. N.C. 2004).

Columbia also argues that granting priority to insurance provider's claims is consistent with the

expressed intent of Congress to protect employee fringe benefits.  In *Saco Local Development*

*Corp.,* the Court wrote:

> Neither do we see any reason to deny insurance companies the right to obtain the
> priority for premiums attributable to insurance plan fringe benefits. To allow the
> insurer to obtain its premiums through the priority would seem the surest way to
> provide the employees with the policy benefits to which they are entitled. In

---

[12]Interestingly, the case cited in this quotation, *In re Montaldo Corp.,* 207 B.R. 112, 114 (Bankr.
M.D. N.C. 1997), was reversed on appeal by *Aetna Life Ins. Co. v. The Montaldo Corp. (In re The
Montaldo Corp.),* 232 B.R. 853 (M.D. N.C. 1997) (deciding that unpaid insurance premiums for group
life and health insurance for Montaldo's employees were claims for contributions to an employee benefit
plan and entitled to priority status).

principle, as the trustee suggests, the employees might be required to obtain the premiums themselves and pay them over to the insurer if they so chose; in practice, however, this would simply require a more complicated administrative path to the same result. The employees cannot be harmed by the insurance company's right to assert the § 507(a)[(5)] priority, for the priority is expressly subordinated to the § 507(a)[(4)] wage priority.

*In re Saco Local Dev. Corp.,* 711 F.2d 441, 449 (1st Cir. 1983).[13]

As illustrated in the cases cited by Columbia and the Debtors, courts are split over the issue of whether a claim by an insurance provider, such as Columbia, may receive priority treatment under § 507(a)(5). The applicable statutory language is found in Bankruptcy Code § 507(a)(4) and § 507(a)(5),[14] which provide, in pertinent part:

> (a)   The following expenses and claims have priority in the following order:
>
>   . . . .
>
>   (4)   Fourth, allowed unsecured claims, but only to the extent of $12,475 for each individual or corporation, as the case may be, earned within 180 days before the date of the filing of the petition or the date of the cessation of the debtor's business, whichever occurs first, for - -
>
>     (A)   wages, salaries, or commission, including vacation, severance, and sick leave pay earned by an individual;
>
>   . . . .
>
>   (5)   Fifth, allowed unsecured claims for contributions to an employee benefit plan - -
>
>     (A)   arising from services rendered within 180 days before the date of the filing of the petition or the date of the cessation of the debtor's business, whichever occurs first; but only
>
>     (B)   for each such plan, to the extent of - -
>
>       (i)   the number of employees covered by each such plan multiplied by $12,475; less

---

[13]The previous version of Bankruptcy Code § 507 relied on in *Saco Local Development*, § 507(a)(3) granted priority status to claims for wages and § 507(a)(4) granted priority to contributions to employee benefit plans.

[14]These two subsections are linked due to the combined cap imposed on the two priorities (set at $12,475 in the latest version of the statute, but at $10,950 at the time the chapter 11 cases were filed). *See Howard Delivery Serv., Inc. v. Zurich Am. Ins. Co.,* 547 U.S. 651, 660, 126 S.Ct. 2105, 2111-12, 165 L.Ed.2d 110 (2006)

(ii)     the aggregate amount  paid to such employees under
paragraph (4) of this subsection, plus the aggregate
amount paid by the estate on behalf of such employees
to any other employee benefit plan.

11 U.S.C. § 507(a)(4) and (5).

Two decisions of the United States Supreme Court made in 1959 and 1968 held that the

priority status granted under the 1898 Bankruptcy Act to claims for "wages"  did not include

contributions to a union welfare plan (which provided life insurance, weekly sick benefits,

hospital and surgical benefits) or contributions to an employees' annuity plan.  *Howard Delivery*

*Serv., Inc. v. Zurich Am. Ins. Co.,* 547 U.S. 651, 658, 126 S.Ct. 2105, 2110-11, 165 L.Ed.2d 110

(2006) citing *United States v. Embassy Restaurant, Inc.,* 359 U.S. 29, 79 S.Ct. 554, 3 L.Ed.2d

601 (1959) and *Joint Industry Bd. of Elec. Industry v. United States*, 391 U.S. 224, 88 S.Ct.

1491, 20 L.Ed.2d 546 (1968).  Congress added § 507(a)(5) when it amended the Bankruptcy Act

in 1978 "[t]o provide a priority for fringe benefits of the kind at issue in *Embassy Restaurant* and

*Joint Industry Bd.."  Howard Delivery Serv.,* 547 U.S. at 658.   The *Howard Delivery Service*

Court wrote:

> Notably, Congress did not enlarge the "wages, salaries, [and] commissions" priority,
> § 507(a)(4), to include fringe benefits. Instead, Congress created a new priority for
> such benefits, one step lower than the wage priority. The new provision, currently
> contained in § 507(a)(5), *allows the provider of an employee benefit plan to recover
> unpaid premiums - -* albeit only after the employees' claims for "wages, salaries, or
> commissions" have been paid. § 507(a)(4).

*Id.* (emphasis added.)  In *Howard Delivery Service,* the Supreme Court held that premiums owed

by an employer to a workers' compensation carrier are not "employee benefits" entitled to

priority treatment under § 507(a)(5).[15] *Id.,* 547 U.S. at 668. Although the holding does not apply directly to the matter before me,[16] the Court's discussion about § 507(a)(5) priorities in *Howard Delivery Service* is instructive and appears to accept that a provider's claim for employee benefits that is based on services rendered by the debtor's employees during the relevant time period (i.e., 180 days prior to the petition date  or the date of the cessation of the debtor's business, whichever occurs first) is entitled to priority status, subject to the restrictions in § 507(a)(5)(B).[17]

The Debtors argue that allowing priority claims to third-party providers of employee benefit plans permits the third-parties to share the same statutory priority as the employees. However, the employees are protected since the third-party's right to assert a priority is expressly

---

[15] The *Howard Delivery Service* Court wrote: "[W]e find it far from clear that an employer's liability to provide workers' compensation coverage fits the § 507(a)(5) category 'contributions to an employee benefit plan ... arising from services rendered.' Weighing against such categorization, workers' compensation does not compensate employees for work performed, but instead, for on-the-job injuries incurred; workers' compensation regimes substitute not for wage payments, but for tort liability. Any doubt concerning the appropriate characterization, we conclude, is best resolved in accord with the Bankruptcy Code's equal distribution aim. We therefore reject the expanded interpretation Zurich invites. Unless and until Congress otherwise directs, we hold that carriers' claims for unpaid workers' compensation premiums remain outside the priority allowed by § 507(a)(5). *Howard Delivery Serv.,* 547 U.S. at 668.

[16] Columbia's request for payment of workers' compensation premiums was limited to its administrative expense claim for post-petition payments under § 503(b).

[17] In the dissenting opinion for *Howard Delivery Service,* Justice Kennedy also noted: "The Court seems to accept that insurance payments can receive the priority, . . . and this is part of the statute's necessary operation. Even if the payments may go to the insurance company, they are predicated nonetheless on the employees' performing services for the employer. They therefore 'aris[e] from services rendered' in the same manner as do payments to a pension, health, or disability plan. From a practical standpoint, moreover, '[t]o allow the insurer to obtain its premiums through the priority would seem the surest way to provide the employees with the policy benefits to which they are entitled.' *In re Saco Local Dev. Corp.,* 711 F.2d 441, 449 (C.A.1 1983) (majority opinion by BREYER, J.)." *Howard Delivery Serv.,* 547 U.S. at 670 (dissent).

*Accord In re DeWitt Rehabilitation and Nursing Ctr., Inc.,* 476 B.R. 827 (Bankr. S.D.N.Y. 2012) (holding that the claim of a temporary staffing agency for employee benefits was not entitled to priority treatment under § 507(a)(5) because the employees whose benefits were paid were not at any time employees of the debtor, but were employees of the temporary staffing agency).

subordinated to the wage priority. *Saco Local Dev.,* 711 F.2d at 449. Allowing the provider to recover benefits (that were provided to the Debtors' employees) furthers the statute's goal of protecting the debtor's employees. Therefore, Columbia's claims for benefits provided to the Debtors' employees during the relevant time period are entitled to priority status under § 507(a)(5). However, as mentioned above, Columbia's priority claim is limited by the restrictions in § 507(a)(5)(B). Before Columbia may receive payment of a priority claim, it must demonstrate that its claim does not exceed the limitations set in § 507(a)(5)(B).

Accordingly, summary judgment is granted, in part, as to the priority status of Columbia's § 507(a)(5) claims, but denied, in part, because payment must await a showing that the claim amount does not exceed the limitations of § 507(a)(5)(B).

### 2. *Bankruptcy Code Section 503(b)*

Alternatively, Columbia argues that its prepetition and postpetition claims are entitled to treatment as "substantial contribution" administrative expenses pursuant to § 503(b)(3)(D). Columbia also claims that postpetition payments are entitled to treatment as administrative expenses pursuant § 503(b)(1)(A). Both sections require Columbia to show an actual, demonstrable benefit to the estate. As discussed above in connection with Wimar's claims, at this time, the pending adversary proceeding raises issues of material fact with respect to the benefit provided to the Debtors under the Service Agreements. Therefore, Columbia's request for summary judgment pursuant to Bankruptcy Code § 503(b)(3)(D) and § 503(b)(1)A) will be denied.

22

### *CONCLUSION*

For the reasons set forth above, Wimar's Motion for Summary Judgment is denied.  Also,

for the reasons set forth above, Columbia's Motion for Summary Judgment is granted, in part, to

allow priority status under Bankruptcy Code § 507(a)(5) for contributions to employee benefit

plans made within 180 days preceding the Petition Date, and is denied, in part, regarding

Columbia's request for payment of the priority claims under § 507(a)(5) until it is determined

whether the claim amounts exceed the limitations of § 507(a)(5)(B).  Moreover, Columbia's

Motion for Summary Judgment for allowance and payment of claims under Bankruptcy Code

§ 503(b)(1)(A) and § 503(b)(3)(D) is denied.

An appropriate order follows.


BY THE COURT:


_____

KEVIN J. CAREY
UNITED STATES BANKRUPTCY JUDGE


Dated: October 14, 2015